# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**ALLEN WILLIAMS**                                **CIVIL ACTION NO. 14-382**

**VERSUS**                                        **JUDGE JOHN W. deGRAVELLES**

**E.I. du PONT de NEMOURS AND**                   **MAG. JUDGE STEPHEN C.**
**COMPANY**                                       **RIEDLINGER**

## RULING AND ORDER

Before the Court is E.I. du Pont de Nemours and Company's Motion for Partial Dismissal, or in the Alternative, Motion for Partial Summary Judgment ("Motion for Partial Dismissal"). (Doc. 9). Plaintiff opposes the motion. (Doc. 15). The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1343 and 42 U.S.C. § 2000e-5(f)(3). Oral argument is not necessary.

After carefully considering the law, facts, and arguments of the parties, Defendant's Motion for Partial Dismissal is granted in part and denied in part. Defendants' motion is granted in that, as a matter of law, Plaintiff's § 1981 claims that arose prior to June 20, 2010 are time barred by the four year statute of limitations under 28 U.S.C. § 1658(a). Defendants' motion is granted in that, as a matter of law, Plaintiff's Title VII claims that arose prior to 2010 are not actionable as discrete discriminatory acts because Plaintiff failed to administratively exhaust these claims.

Furthermore, to the extent that DuPont's motion was intended to reach a hostile work environment claim, DuPont's Motion for Partial Dismissal is denied without prejudice. DuPont is granted leave to file a motion to dismiss on this issue. In all other respects Defendant's motion is denied.

# I. Relevant Factual and Procedural Background

## A. Introduction

This case arises out of Defendant's, E.I. du Pont de Nemours and Company ("DuPont"), alleged unlawful employment practices. Plaintiff, Allen Williams ("Williams"), brought suit pursuant to Title VII, 42 U.S.C, §2220e-5(e) and §2000e-5(f) alleging racial discrimination and retaliation. (Doc. 1, p. 18). Further, Williams amended his complaint to assert that DuPont is liable under 42 U.S.C. § 1981. (Doc. 13, p. 3). DuPont is seeking partial dismissal of Williams' claims or partial summary judgment.

As a preliminary matter, DuPont has withdrawn its request for dismissal of paragraphs 47 and 56-64 of Williams' Complaint. (Doc. 25, p. 1 n. 2). These paragraphs concern the events that occurred in and after December 2010. As these events are no longer at issue for this motion, the Court will only briefly summarize these allegations below.

## B. Plaintiff's Allegations

### 1. Williams' Allegations Regarding his Early Years at DuPont

Williams alleges that he has worked at DuPont Burnside plant since 2000, when he was initially hired as a "Tank Car Loader." (Complaint, Doc. 1, p. 2 ¶ 6). Williams asserts that "[r]acial discrimination has been an ongoing problem at the Burnside plant since 2002[.]" *Id.* at ¶ 7. Williams claims that in 2002 "George Valentine ("Valentine"), a white male, manipulated his way to the position of Operations Supervisor, ousting Percy Bell ("Bell"), a black man, who had been tapped for and had begun training for the position." *Id.*

Williams contends that Valentine "often refers to African American employees as 'the brothers' and to Caucasian employees as 'buddy,' 'bud' or 'bubba.' " *Id.* at ¶ 8. Williams asserts that "Valentine encouraged an environment that treated Caucasians more favorably than African-

Americans." (Doc. 1, p. 3 ¶ 9). Williams asserts that Valentine "would assign African-Americans to perform the more physically demanding tasks and instruct Caucasians who held the same position to leave that type of work for 'the brothers.' " *Id.*

Williams alleges that "[w]hile he was a railcar loader, he frequently loaded eight to ten railcars per day while Caucasian employees only were required to load two to three cars per day." (Doc. 1, p. 3 ¶ 10). Williams asserts that Bell, a 35-year employee of DuPont, has previously testified that "the railcar job is the hardest job on the plant, and [Valentine] used that as, like, his strap you know." *Id.* ¶ 11. DuPont admits that the testimony was given, but denies the conclusion drawn from it by Plaintiff. (Doc. 10, p. 3 ¶ 11).

Williams alleges that Valentine would order him to move cars that had already been loaded or that he would create other work for him and other African American workers. (Doc. 1, p. 3 ¶ 10). Williams contends that "Caucasian employees were not required to do such extra work; instead Caucasian employees were allowed to sit in the control room, joking and clowning around during those times." *Id.*

Williams alleges that "African American employees were required to do work that required wearing an acid suit … when their Caucasian counter parts with less seniority were not required to do that work." (Doc. 1, p. 3, ¶ 13). Williams asserts that this "was oppressive." *Id.* Williams further alleges that Valentine "aggressively supervised and monitored African-American employees to watch for mistakes and imposed discipline on them when Caucasian employees would not receive discipline for the same conduct." (Doc. 1, p. 4, ¶ 14).

Williams alleges that Valentine previously testified that if he based a decision he made on race, that it would be a racist decision. (Doc. 1, p. 4, ¶ 15). DuPont admits that Valentine gave the testimony. (Doc. 10, p. 3, ¶ 15). Williams further asserts that in 2002, Ryan Becnel, a

Caucasian, and Bryan Geasan, an African American, were hired as tank car loaders. (Doc. 1, p. 4, ¶ 16). Williams contends that Geasan worked with him on a twelve hour shift, from 11:00 a.m. until 11:00 p.m., while Becnel worked a twelve hour shift from 5:00 a.m. until 1:00 p.m. *Id.* at ¶ 17 Williams asserts that Valentine "told [Becnel] … to 'leave the work for the brothers,' " when Becnel left work at 1:00 p.m. *Id.*

Williams alleges that "[t]hroughout his employment at DuPont, [he] has felt the need to stay out of the way of [Valentine], working in fear of what Valentine may do to him or encourage others (who cooperate with Valentine including Plant Managers) to do to him." (Doc. 1, pp. 45 ¶ 18). Williams claims that he was fearful of complaining because he did not want to get in trouble or lose his job. *Id.*

Williams contends that in 2007, two positions in operations became available. (Doc. 1, p. 5 ¶ 19). Williams asserts that he overheard a white male coworker, Ivy Alberes, say that Becnel should be put in operations over Geasan because "there were enough colored people in operations." *Id.* Williams alleges that Alberes was "in good graces with [Valentine] and [was] known to be one of the 'good ole boys.' " *Id.* Williams alleges that he was moved into operations along with Becnel, while Geasan, who was more senior than Becnel, was terminated. *Id.* at ¶ 19-20.

Williams alleges that when he was initially assigned to work in operations, his senior shift partner, as well as mentor and trainer, was Jeff Simoneaux. (Doc. 1, p. 5 ¶ 22). Williams alleges that after he became an operator in 2007, "he was communicating over the plant-wide radio system, and [Valentine] came on the plant-wide radio, after [him], and corrected [his] grammar, telling [him] how he was supposed to pronounce the words he was using." (Doc. 1, p.

5 ¶ 21). Williams asserts that other employees heard Valentine and "commented on it which was hurtful and embarrassing to [him]." *Id.*

## 2. The Alleged Shift Change

Williams alleges that in December 2009 he heard rumors of a pending shift change that would affect him. (Doc. 1, p. 6 ¶ 24). Williams contends that on January 20, 2010[1] at 8:56 a.m., Valentine sent an email to all of management, to him, and to others, which stated that he and Nathaniel Rapp would be assigned to new shifts. *Id.* at ¶ 25. Williams asserts that he and Rapp were the two African Americans on "the shift."[2] *Id.* Williams claims that Valentine reassigned him to a shift with Rapp because Rapp was "considered at the plant to work haphazardly and in a disorganized fashion." *Id.* Williams alleges that the reassignment "would make it easier for [Valentine] to find errors made by [him] and would hinder his growth as an operator." *Id.*

Williams asserts that the January 20, 2010 email stated that the changes would strengthen the shift. (Doc. 1, p. 6 ¶ 26). Williams claims that this implied that he and Rapp were not performing well in their current positions. *Id.* Williams alleges that his "reputation was damaged by this email and his chances of receiving promotions diminished as a result." *Id.* Further, Williams claims that he "was never approached privately regarding the email or its contents." *Id.*

Williams contends that Simoneaux sent an email to Valentine and other DuPont managers on January 20, 2010, "expressing his concerns about the apparent discrimination and harassment of his African American co-workers, including [Williams], and requested a meeting." (Doc. 1, pp. 6-7 ¶ 27). Williams alleges that he and Simoneaux "each met with the plant

---

[1] While January 20, 2010 was the date that Williams alleges that the email stating he would be subject to a shift change was sent out, Williams' EEOC charge asserts that the shift change occurred on January 24, 2010. (Doc. 9-2, p. 1). The Court construes this apparent discrepancy as Williams being informed of the shift change by the January 20 email, and that the shift change did not occur until January 24.

[2] It appears that Williams is alleging that he and Rapp were the only two African Americans on a specific shift. However, it is not clear which shift he is referring to in his complaint. Even so, it is reasonable for the Court to infer that Williams is referring to the shift he was working on prior to the alleged shift change.

manager, Don Janezic, regarding their concerns over the shift change." (Doc. 1, p. 7 ¶ 28). Williams claims that Janezic "said they would have to deal with [Valentine]." *Id.*

Williams alleges that on January 21, 2010, "Simoneaux sent an email to [Valentine] on behalf of himself, [Williams] and others affected by the shift change, invoking the formal grievance procedure pursuant to plant policy." (Doc. 1, p. 7 ¶ 29). Williams contends that on January 25, 2010, "[he], [Simoneaux] and [Rapp], the other African American affected by the shift change, drafted a document regarding the racial discrimination at DuPont and their intent to file a grievance." (Doc. 1, p. 7 ¶ 30). Williams further claims that on the morning of January 26, 2010, "[Valentine] directed [Simoneaux] to come into his office." (Doc. 1, p. 7 ¶ 31). Williams asserts that "[Simoneaux] told [Valentine] that his two co-workers, including [Williams], felt that Valentine was discriminating against them and asked to have a meeting, pursuant to Plant procedure, with [Valentine], [Williams] and the other shift-workers affected by the shift change." *Id.*

Williams asserts that Simoneaux "delivered the document to [Valentine] on January 26, 2010 and referred to the grievance procedure which allowed the workers involved to meet with the Plant Manager to discuss the situation." (Doc. 1, pp. 7-8 ¶ 32). Williams alleges that Valentine "grabbed the procedure book out of Simoneaux's hand and threw it across the room and said, 'I don't give a S-H-I-T what it says in the book, I'm not meeting with y'all, and that's it.' " (Doc. 1, p. 8 ¶ 32). Williams claims that Simoneaux contacted Human Recourses ("HR"), and that over the next several months he and others involved met with various members of HR as part of an investigation that began. (Doc. 1, p. 8 ¶ 33).

Williams alleges that during the Spring of 2010, "Caucasian employees made derogatory comments about [Williams], [Rapp], [Simoneaux] and Leo Scott because they met with

DuPont's [HR] department about the discriminatory actions of [Valentine]." (Doc. 1, p. 8 ¶ 34).

Williams contends that "by April 1, 2010, notes had already been prepared by [HR] detailing statements to [HR] that had been taken from employees, including [Williams]." (Doc. 1, p. 8 ¶ 35).

### 3. The Alleged Retaliation

Williams claims that on April 6, 2010, he received a write-up, a form of discipline. (Doc. 1, p. 8 ¶ 36). This was the first in his career at DuPont. *Id.* Williams contends that while he was working loading trucks, a truck "came in with the unloading hose still hooked up; however, the hose was lying secured in the hose tray." (Doc. 1, pp. 8-9 ¶ 36). Williams alleges that the truck "was properly loaded, seals were placed on the dome and the rear outlet valve was secured, but the hose was still connected in the rear." (Doc. 1, p. 9 ¶ 36). Williams claims that "DuPont's safety coordinator, T. J. Ozbun, noticed the attached hose but did not mention anything to the truck driver." *Id.* Williams asserts that Ozbun went to the control room to find out who was loading the trucks. *Id.*

Williams alleges that when Ozbun found out he was the one loading trucks, "Ozbun then said that he had seen the end of a hose attached to the back of a trailer and that he was going to tell [Valentine]." *Id.* Williams claims that "Valentine called Plaintiff over the radio and ordered him into his office and gave him a write-up." Williams alleges that Ozbun is part of Valentine's "good ole boy network." *Id.*

Williams claims that he "was accused of violating a procedure, but there was no procedure saying that one could not load a truck that was hooked to a hose, as long as it was flanged at the end." (Doc. 1, p. 9 ¶ 37). Williams alleges that "[n]o such procedure was cited in the write up." *Id.* Williams contends that he "wrote his objections on the bottom of the write-up

and stated that he had just met with [HR] prior to the write-up." *Id.* Williams asserts that writing on the bottom of the write-up "indicate[d] his belief that the write-up was retaliatory." *Id.* Further, Williams claims that he immediately went "to the plant manager's office and complained, but the plant manager took no action and said not to worry about it." *Id.*

Williams alleges that he returned to Valentine's office at a later time and requested a copy of the write-up. (Doc. 1, p. 9 ¶ 38). Williams asserts that "Valentine had the write-up on his desk and picked it up and threw it at [him]." *Id.* Williams claims that he picked up the write-up, went and made a copy, and "[w]hen he returned with the original, Valentine snatched it out of his hand and slammed it on his desk." *Id.* Williams alleges that he "was extremely hurt by this conduct" and that "he had never broken any rules or had a write-up before." *Id.* Williams contends that this "treatment was retaliation for his recent meetings with [HR]." *Id.*

Williams claims that "[s]hortly after the incident regarding the fuel hose, it was determined that the truck was legal by plant standards." (Doc. 1, p. 9-10 ¶ 39). Williams asserts that even though the truck was determined to be legal, he "still had a write-up in his file." (Doc. 1, p. 10 ¶ 39). Williams alleges that "DuPont management enforced rules against [him] that had not previously been enforced and created rules to deprive him of his federally protected rights." (Doc. 1, p. 10 ¶ 40). Williams contends that "DuPont supervisors intentionally tried to find a rule that they could say [he] broke in order to retaliate against him for talking to [HR] about racial discrimination at the plant." *Id.*

Williams alleges that "Caucasian workers were not written up for such things." (Doc. 1, p. 10 ¶ 41). Williams claims that during his employment, "three Caucasian employees melted down the SO$_3$ unit, which could have had disastrous effects on their coworkers and the

community." *Id.* Williams contends that "these three employees were not sent home and did not receive write-ups or notes to file." *Id.*

Williams further claims that "Damon Babin, another Caucasian employee, violated a life saving rule by removing a hose from the $SO_3$ manifold without wearing proper protective gear." (Doc. 1, p. 10 ¶ 42). Williams alleges that this violation "was committed in front of the Plant Manager, Tom Miller." *Id.* Williams contends that "Babin was not sent home and did not receive a write up or note to file." *Id.*

Williams asserts that he "timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ... in accordance with Title VII, 42 U.S.C. §2000e-5(e)." (Doc. 1, p. 18). However, Williams is not specific as to the date he filed the charge. Even so, DuPont attaches his charge to their motion, which shows that his charge was filed withe EEOC on September 13, 2010. (Doc. 9-2, p. 1).

### 4. Events In and After December 2010

As the events after the alleged retaliation are not at issue in this motion, they can be quickly summarized. Williams alleges that he was subject to heightened job scrutiny after the shift change and write up. (Doc. 9-2 p. 10). Williams asserts that he was out of work for extended periods of time after these events in 2010 as well as 2012 and 2013. *Id.* at pp. 10-15. Williams contends that he was docked two hours pay in 2013 because he was denied permission to make up hours. *Id.* at 16. Williams alleges this denial was inconsistent with DuPont Policy. *Id.* Further, Williams asserts that on January 24, 2014 he was required to take twelve hours of vacation time when he was unable to get to work because of icy roads. (Doc. 1, p. 16). Williams asserts that a Caucasian co-worker was not required to take vacation time for the same events. *Id.*

Williams asserts that DuPont violated Title VII by racially discriminating against him and retaliating against him. Williams also asserts in his amended complaint that DuPont is liable under 42 U.S.C. § 1981.

## II.    Present Motion

DuPont now moves for dismissal pursuant to Fed.R.Civ.P. 12(b)(6). (Doc. 9). DuPont alternatively moves for summary judgment pursuant to Fed.R.Civ.P. 56. (Doc. 9).

### A.  DuPont's Argument

DuPont argues that Williams failed to administratively exhaust the alleged discrete acts that occurred prior to the alleged January 24, 2010 shift change. (Doc. 9-1, p. 4). DuPont argues that Williams failed to timely file charges with the EEOC for the following claims: Williams' claim that he was required to load more railcars than his Caucasian co-workers; Williams' claim that supervisors would not let him wait in the control room and created more work for him to do, but allowed Caucasian co-workers to wait in the control room; Williams' allegation that he perceived a hostile environment and why he did not complain about Valentine prior to 2010, and; Williams' allegation that Valentine corrected his grammar over the plant-wide radio system. (Doc. 9-1, pp. 5-6). DuPont argues that these are discrete discriminatory acts that Williams failed to exhaust administrative remedies for because he failed to file a charge with the EEOC. *Id.*

### B.  Williams' Argument

Prior to filing a memorandum in opposition, Williams amended his complaint on September 23, 2014 to include allegations that DuPont is liable under 42 U.S.C. § 1981. [3] (Doc. 13). Williams argues that the allegations in his complaint are not discrete discriminatory acts. (Doc. 15, pp. 3-4). Williams claims that the allegations in his Complaint fall under the

---

[3] Williams also argued that his amended complaint rendered moot DuPont's request to dismiss his claims for occurrences after 2010. However, as DuPont has withdrawn its request to dismiss these claims, the Court need not address this argument.

continuing violations doctrine. *Id.* Williams asserts that "his original complaint regarding pre-2010 conduct on the part of [DuPont] include allegations of unlawful promotion and transfer." *Id.* Williams argues that these allegations "are supportive of a continuing violation." *Id.*

### C. DuPont's Reply

DuPont argues in its reply[4] that 42 U.S.C. § 1981 is subject to a four-year statute of limitations. (Doc. 25, p. 2). DuPont claims that because Williams amended his complaint on September 23, 2014, Williams claims prior to September 23, 2010 are time barred. (Doc. 25, p. 2-3). DuPont asserts that Williams claims "that were included in [his] EEOC Charge … are time-barred from recovery under § 1981." (Doc. 25, p. 3).

Furthermore, DuPont asserts that all discrete acts which occurred more than 180-days prior to Williams September 13, 2010 EEOC Charge are time barred. (Doc. 25, p. 4). DuPont claims that the January 24, 2010 allegation concerning the schedule change is also time barred. *Id.* DuPont argues that the 180-day limitation applies because, even though Louisiana is a 300-day deferral state, Williams "did not initiate a claim with a state or local agency, nor are his claims based on state law." (Doc. 25, p. 5).

Finally, DuPont argues that the continuing violations doctrine does not apply because the Supreme Court rejected the continuing violations doctrine in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). (Doc. 25, p. 6). DuPont contends that Williams pre-2010 allegations constitute discrete discriminatory acts which are separate, actionable "unlawful employment practice[s]." (Doc. 25, p. 7). DuPont asserts that because Williams pre-2010 claims fall outside the filing period, they are not actionable. *Id.*

---

[4] DuPont filed a Reply Memorandum (Doc. 18) which informed the Court that it would file a timely memorandum to rebut Williams' Memorandum in Opposition. DuPont subsequently filed a Supplemental Memorandum in Support. (Doc. 25). For the purposes of this motion, the Court treats DuPont's Supplemental Memorandum as a reply.

### D. Williams' Supplemental Argument

Williams counters that his amended complaint asserting a claim under § 1981 relates back to his original filing day of June 20, 1010 pursuant to Fed.R.Civ.P. 15(c)(1)(B). (Doc. 40, p. 2). Williams argues that his claims are "viable … for any discriminatory actions by DuPont on or after June 20, 2010." *Id.*

Williams further claims he had 300 days to file his EEOC Charge for his allegations related to the shift change because Louisiana is a deferral state with a work sharring agreement with the EEOC (Doc. 40, p. 3). Williams asserts that because of the work sharing agreement, a filing with the EEOC serves the charge on the Louisiana Commission on Human Rights ("LCHR"), which has the authority to remedy his employment discrimination claim. (*Id.*). Thus, Williams argues that, pursuant to the work share agreement, because he filed his charge timely with the EEOC, he also filed it timely with the LCHR.

Further, Williams asserts that *Morgan* did not overrule the Fifth Circuit's continuing violations doctrine. (Doc. 40, p. 5 n. 7). Williams argues that the Fifth Circuit has continued to apply the continuing violations doctrine post-*Morgan*. *Id.* However, Williams asserts that pre-2010 "allegations DuPont argues are time barred … are provided as 'background evidence in support of a timely claim.' " (Doc. 40, p. 6 n. 8) (quoting *Morgan*, 536 U.S. at 113). Williams asserts that his allegations that he "was forced to load significantly more railcars than his Caucasian coworkers provides background to more recent acts of discrimination." *Id.*

Finally, Williams argues that he has alleged sufficient facts to state a claim for relief under the "hostile work environment" theory. (Doc. 40, p. 6). Williams contend that "[c]ourts look at all the circumstances present in the work environment when assessing a hostile work environment claim, including 'the frequency of the discriminatory conduct; its severity; whether

it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " *Id.* (quoting *Morgan*, 536 U.S. at 117. Williams claims he has alleged frequent and severe discriminatory conduct, which was humiliating and interfered with his work performance. *Id.*

### III.     Motion to Dismiss Standard

In *Johnson v. City of Shelby, Mississippi*, 574 U.S. ____, 135 S.Ct. 346 (2014), the Supreme Court has explained, "Federal pleading rules call for "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. Rule Civ. Proc. 8(a)(2); they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Id.*, 135 S.Ct. at 346-347 (citation omitted).

Interpreting Rule 8(a) and *Twombly*, the Fifth Circuit explained:

> The complaint (1) on its face (2) must contain enough factual matter (taken as true) (3) to raise a reasonable hope or expectation (4) that discovery will reveal relevant evidence of each element of a claim. "Asking for [such] plausible grounds to infer [the element of a claim] *does not impose a probability requirement* at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal [that the elements of the claim existed]."

*Lormand v. US Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009) (quoting *Twombly*, 127 S.Ct. at 1965) (emphasis added).

Analyzing the above case law, our brother in the Western District stated:

> Therefore, while the court is not to give the "assumption of truth" to conclusions, factual allegations remain so entitled. Once those factual allegations are identified, drawing on the court's judicial experience and common sense, the analysis is whether those facts, which need not be detailed or specific, allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 129 S.Ct. at 1949, *Twombly*, 555 U.S. at 556, 127 S.Ct. at 1965. This analysis is not substantively different from that set forth in *Lormand*, *supra*, nor does this jurisprudence

> foreclose the option that discovery must be undertaken in order to raise relevant information to support an element of the claim. The standard, under the specific language of Fed. Rule Civ. P. 8(a)(2), remains that the defendant be given adequate notice of the claim and the grounds upon which it is based. This standard is met by the "reasonable inference" the court must make that, with or without discovery, the facts set forth a plausible claim for relief under a particular theory of law provided there is a "reasonable expectation" that "discovery will reveal relevant evidence of each element of the claim." *Lormand*, 565 F.3d at 257, *Twombly*, 555 U.S. at 556, 127 S.Ct. at 1965.

*Diamond Services Corp. v. Oceanografia, S.A. De C.V.*, No. 10-177, 2011 WL 938785, at *3

(W.D.La. Feb. 9, 2011) (citation omitted).

Finally, in *Thompson v. City of Waco, Texas*, 764 F.3d 500 (5th Cir. 2014), the Fifth

Circuit recently summarized the Rule 12(b)(6) standard as thus:

> We accept all well-pleaded facts as true and view all facts in the light most favorable to the plaintiff. We need not, however, accept the plaintiff's legal conclusions as true. To survive dismissal, a plaintiff must plead enough facts to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Our task, then, is to determine whether the plaintiff stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success.

*Id.* at 502-03 (citations and internal quotations omitted).

## IV. Discussion

### A. Title VII Claims

#### 1. Louisiana's Status as a Deferral State

First, it must be determined whether Williams timely filed his EEOC Charge concerning

the January 24, 2010 shift change. DuPont argues that Williams January 24, 2010 EEOC charge

was not filed timely within the 180-day time period and that the 300-day time period does not

apply because he did not file a charge with a Louisiana agency. (Doc. 25, p. 4).

Williams counters that Louisiana is a 300-day deferral state with a work share agreement with the EEOC. (Doc. 40, p. 3). Williams asserts that because of the work sharing agreement, a filing with the EEOC serves the charge on the Louisiana Commission on Human Rights ("LCHR"). *Id.*

Here, the Court agrees with Williams. The Fifth Circuit has explained that:

> Pursuant to 42 U.S.C. § 2000e-5(e), an EEOC charge must be filed within 180 days after the alleged unlawful employment practice. That time period is extended to 300 days if "the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice." 42 U.S.C. § 2000e-5(e). The Louisiana Commission on Human Rights has authority to remedy employment discrimination, rendering Louisiana a "deferral state." *See* La.Rev.Stat. Ann. § 51:2231, *et seq.* This court has held that when a claimant submits an EEOC charge and, pursuant to a work-sharing agreement, the EEOC accepts it on behalf of a deferral state, the claimant is deemed to have initially instituted proceedings with the state agency and the 300-day period is triggered. *Vielma v. Eureka Co.,* 218 F.3d 458, 462 (5th Cir.2000); *Griffin v. City of Dallas,* 26 F.3d 610, 612-13 (5th Cir.1994).

*Conner v. Louisiana Dep't of Health & Hospitals*, 247 F. App'x 480, 481 (5th Cir. 2007).

More recently, the Fifth Circuit has restated that Louisiana has a workshare agreement with the EEOC:

> The LCHR is a state agency that has authority to remedy employment discrimination pursuant to a work sharing agreement with the Equal Employment Opportunity Commission ("EEOC"). *Conner v. La. Dep't. of Health & Hosp.*, 247 Fed.Appx. 480, 481 (5th Cir.2007) (per curiam) (unpublished); La.Rev.Stat. Ann. §§ 51:2231–51:2265. Because the LCHR exists, Louisiana is considered a "deferral state." *Conner*, 247 Fed.Appx. at 481.

*Kirkland v. Big Lots Store, Inc.*, 547 F. App'x 570, 572 n. 1 (5th Cir. 2013).

Thus, the filing period for the January 24, 2010, shift change was 300-days because Louisiana is a deferral state with a work sharing agreement with the EEOC and the LCHR has authority to remedy employment discrimination. Williams' 300-day deadline would have been

November 20, 2010. As he filed his charge on September 13, 2010, he was within this 300-day deadline.

Accordingly, the Court denies DuPont's Motion for Partial Dismissal in this respect.

### a. Retaliation Claims Could not be Remedied by the LCHR until 2014

While Williams' January 24, 2010 shift change had a 300-day deadline, Williams' April 6, 2010 retaliation claim is subject to a 180-day deadline. Even though neither party raises this argument, the Court nonetheless addresses this issue.

The filing period under Title VII is only extended to 300 days if "the person aggrieved has initially instituted proceedings with a State or local agency *with authority to grant or seek relief from such practice*." 42 U.S.C. § 2000e-5(e).

As this Court has previously explained:

> *Smith v. Parish of Washington,* 318 F.Supp.2d 366, 373 (E.D. La. 2004), [held] that anti-retaliation provisions are absent from the sections of the [Louisiana Employment Discrimination Law ("LEDL")] that prohibit discrimination based on race, color, religion, sex and national origin. Judge Fallon reasoned in that case that "[i]n the new Employment Discrimination Law, the legislature included anti-retaliation provisions in the sections addressing age and sickle-cell trait discrimination. Had the legislature intended to include parallel provisions in the other sections, they would have done so." *Smith v. Parish of Washington,* 318 F.Supp.2d 366, 373 (E.D. La. 2004).

> Subsequent to that decision, the legislature amended La. R.S. 51:2256 to include the LEDL, effectively overruling the reasoning of *Smith.* The [2014] amendment of La. R.S. 51:2256 creates a cause of action for retaliation in the case of employees alleging discrimination based on a disability, race, color, religion, sex, national origin, or pregnancy, childbirth and related medical conditions. La. R.S. 51:2256. … However, this amendment did not become effective until August 1, 2014. La. R.S. 51:2256. No mention of intent to apply this amendment retroactively was made by the legislature. *See* Acts 2014, No. 756, Section 1.

*Martin v. Winn-Dixie Louisiana, Inc.*, No. 3:13-CV-00682-JWD, 2015 WL 1281943, at *7-8 (M.D. La. Mar. 20, 2015); *see also Santos v. J.W. Grand, Inc.*, No. CIV.A. 13-00559-SDD, 2015 WL 3456627, at *2 (M.D. La. May 29, 2015); *Liles v. Burkes Outlet Stores, LLC*, No. 2:14-CV-03161, 2015 WL 1975844, at *4 (W.D. La. May 1, 2015).

Thus, employment retaliation claims were not actionable in Louisiana prior to August 1, 2014. Even though Louisiana is a deferral state with a work share agreement with the EEOC, Williams' retaliation claims were subject to the 180-day filing requirement because when he filed his EEOC charge, the LCHR did not have authority to grant him relief for retaliation.

Nevertheless, Williams' EEOC charge was filed within the 180 day window. The alleged retaliation occurred on April 6, 2010. Williams' 180-day deadline would have fallen on October 3, 2010. Williams' EEOC charge was filed on September 13, 2010. (Doc. 9-2, p. 1). Thus, his claim was timely filed with the EEOC.

In sum, Williams timely filed his racial discrimination and retaliation charges within the respective 300-day and 180-day filing deadlines.

### 2. Continuing violations doctrine

Next, it must be determined whether the continuing violations applies to Williams' claims. Williams' admission that his pre-2010 claims are provided as background evidence in support of his timely claim suggests he has abandoned this argument. However, Williams' extensively briefs this issue in both his Memorandum in Opposition and his Supplemental Memorandum in Opposition. Thus, the Court will address this argument.

DuPont argues that the continuing violations doctrine does not apply because the Supreme Court rejected the continuing violations doctrine in *Morgan*. (Doc. 25, p. 6). DuPont

argues that William's pre-2010 claims constitute discrete discriminatory acts which are separate actionable "unlawful employment practice[s]." (Doc. 25, p. 7).

Williams counters that *Morgan* did not overrule the Fifth Circuit's continuing violations doctrine. (Doc. 40, p. 5 n. 7). Williams argues that the Fifth Circuit has continued to apply the continuing violations doctrine post-*Morgan*. *Id.*

Here the Court agrees with DuPont. In *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S. Ct. 2061 (2002), the Supreme Court explained:

> [D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the 180– or 300–day time period after the discrete discriminatory act occurred. The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed. Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.

*Id.* at 113.

The Supreme Court further explained that:

> Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable "unlawful employment practice. [An employee] can only file a charge to cover discrete acts that "occurred" within the appropriate time period.

*Id.* at 114.

Furthermore, while it is true that the Fifth Circuit has continued to apply the continuing violations doctrine post-*Morgan*, the Fifth Circuit has held that *Morgan* has limited the doctrine's applicability. First, the Fifth Circuit has explained the continuing violations doctrine this way:

> [The Fifth Circuit] has consistently held that the continuing violations doctrine is equitable in nature and extends the limitations period on otherwise time barred claims only when the unlawful employment practice manifests itself over time, rather than as a series of discrete acts. *Frank v. Xerox Corp.,* 347 F.3d 130, 136 (5th Cir.2003); *see also Huckabay v. Moore,* 142 F.3d 233, 238–39 (5th Cir.1998). Under the continuing violations doctrine, a plaintiff is relieved of establishing that all of the alleged discriminatory conduct occurred within the actionable period, if the plaintiff can show a series of related acts, one or more of which falls within the limitations period. *Felton v. Polles,* 315 F.3d 470, 487 (5th Cir.2002) (*citing Messer v. Meno,* 130 F.3d 130, 135 (5th Cir.1997)). The end goal of the continuing violation theory is to "accommodate plaintiffs who can show that there has been a pattern or policy of discrimination continuing from outside the limitations period into the statutory limitations period, so that all of the discriminated acts committed as part of this pattern or policy can be considered timely." *Celestine v. Petroleos de Venezuela SA,* 266 F.3d 343, 352 (5th Cir.2001); *see also Hardin v. S.C. Johnson & Son Inc.,* 167 F.3d 340, 344 (7th Cir.1999).

*Pegram v. Honeywell, Inc.*, 361 F.3d 272, 279 (5th Cir. 2004).

The Fifth Circuit then explained how *Morgan* has limited the doctrine:

> The Supreme Court recently clarified the limits of the continuing violations doctrine. In *Nat.'l R.R. Passenger Corp. v. Morgan,* the Court held that discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). Thus, each discriminatory act starts a new clock for filing charges alleging that act. *Id.* In contrast to discrete acts, the Court carved out an exception for claims based on a hostile work environment. Noting that repeated conduct constitutes a part of the nature of hostile environment claims, the Court held that hostile environment claims "will not be time barred so long as all acts which constitute the claim are part of the same unlawful practice and at least one act falls within the time period." *Id.* Therefore, *Morgan* makes clear that claims based on discrete acts are timely only where such acts occurred within the limitations period, and that claims based on hostile environment are only timely where at least one act occurred during the limitations period.

*Id.* at 279-80 (5th Cir. 2004).

Here, Williams has argued that "his original complaint regarding pre-2010 conduct on the part of [DuPont] include allegations of *unlawful promotion and transfer*." (Doc. 15, pp. 3-4) (emphasis added). These allegations are clearly discrete discriminatory acts. Thus, each had their own 180- or 300-day filing period. Williams has not alleged that charges regarding these allegations were filed. Accordingly, Williams' pre-2010 allegations are not actionable.

Even so, Williams' pre-2010 allegations may be used as evidence in support of his timely claims because Title VII does not "bar an employee from using the prior acts as background evidence in support of a timely claim." *Morgan*, 536 U.S. at 113. Therefore, as Williams' pre-2010 claims are not actionable under Title VII as discrete discriminatory acts, DuPont's Motion for Partial Dismissal is granted in this respect.

### 3. Williams' Hostile Work Environment Claim

Finally, Williams argues that he has alleged sufficient facts to state a claim for relief under Title VII in accordance with the hostile work environment theory. (Doc. 40, p. 6). While Williams is not clear as to whether this assertion is related to his pre-2010 claims, it is reasonable for the Court to infer that Williams intended for this argument to apply to these claims. However, DuPont has not had an opportunity to brief this assertion by Williams because Williams' asserted this in his Supplemental Memorandum in Support (Doc. 40). Williams' Supplemental Memorandum was the last filing made with respect to the motion at issue.

Here, the Court declines to address this argument from Williams because DuPont has not had an opportunity to brief a hostile work environment claim. Even so, to the extent that DuPont's motion was intended to reach a hostile work environment claim, DuPont's Motion for Partial Dismissal is denied without prejudice. DuPont is granted leave to file a motion to dismiss on this issue.

## B.  Section 1981

### 1.  Section 1981 Statute of Limitations

The parties agree that claims brought under 42 U.S.C. § 1981 are subject to the four year statute of limitations prescribed by 28 U.S.C. § 1658. However, this agreement by the parties is overly broad.

This Court has previously explained that:

> Section 1981 does not contain a limitations period. Section 1981 employment discrimination claims that are based on conduct occurring *after the formation of a contract have a four year statute of limitations* under 28 U.S.C. § 1658(a). *Jones v. R.R. Donnelley & Sons Co.,* 541 U.S. 369, 124 S.Ct. 1836 (2004); *Johnson v. Crown Enterprises, Inc.,* 398 F.3d 339, 341 (5th Cir.2005). Whereas, a claim cognizable under § 1981 *before* it was amended by the Civil Rights Act of 1991, such as a claim based on the failure to enter into a new contract, is governed by the relevant state personal injury limitations period[.] … Under the pre–1991 version of § 1981 a failure to promote claim was actionable if the promotion rose to the level of an opportunity for a new and distinct relation between the employee and the employer. *Blanson v. Graphic Packaging International, Inc.,* 2007 WL 438193 (W.D.La. Jan. 9, 2007), citing, *Patterson v.. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 2377 (1989).

*Hubert v. City of Baton Rouge/Parish of E. Baton Rouge, Dep't of Pub. Works*, No. CIV.A. 08-515-SCR, 2009 WL 774343, at *1 (M.D. La. Mar. 20, 2009) (emphasis added).

Thus, contrary to the parties assertions, not all § 1981 claims are governed by the four year statute of limitations under 28 U.S.C. §1658(a). However, as Williams is claiming racial discrimination based on alleged conduct that occurred while he was working for DuPont, in other words after the formation of his employment contract, the claims are governed by the four year statute of limitations under § 1658(a). *See Id.* Similarly, § 1658(a) governs Williams retaliation claim. *See Foley v. Univ. of Houston Sys.*, 355 F.3d 333, 339 (5th Cir.2003) (holding that the

Civil Rights Act of 1991 abrogated Supreme Court case law rejecting section 1981 retaliation claims).

### 2. Whether Williams' Amended Complaint Relates Back to his Original Filing Date

DuPont asserts that because Williams amended his complaint on September 23, 2010, "pursuant to the statute of limitations, all claims that occurred before September 23, 2010 are time-barred." (Doc. 25, p. 3). Williams counters that his § 1981 claims relate back to his original filing date of June 20, 2014 pursuant to Fed.R.Civ.P. 15(c)(1)(B). (Doc. 40, p. 2-3).

This Court has previously explained:

> Federal Rules of Civil Procedure Rule 15(c)(1)(B) provides that "[a]n amendment to a pleading relates back to the date of the original pleading when ... the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." The party seeking to have an amendment to a pleading relate back to the original pleading bears the burden of proof in rebutting the statue of limitations. *Dodson v. Hillcrest Securities,* 95 F.3d 52, (5th Cir.1996)….
>
> In addressing the rules regarding relating back, the Fifth Circuit has noted that "[t]he theory that animates this rule is that 'once litigation involving particular conduct or a given transaction or occurrence has been instituted, the parties are not entitled to the protection of the statute of limitations against the later assertion by amendment of defenses or claims that arise out of the same conduct, transaction, or occurrence as set forth in the original pleading.' " *F.D.I.C. v. Conner,* 20 F.3d 1376, 1385 (5th Cir.1994). "In the end though, the best touchstone for determining when an amended pleading relates back to the original pleading is the language of Rule 15(c): whether the claim asserted in the amended pleading arises 'out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading.' " *See id.* at 1386.

*Schultz v. United States*, No. 10-CV-00540, 2012 WL 1123328, at *2 (M.D. La. Apr. 2, 2012).

Here, Williams' amended complaint has asserted that the same conduct and occurrences that were set out in his original pleading allegedly make DuPont liable under § 1981. (Doc. 13). In his First Amended Complaint, Williams clarified the circumstances around his EEOC charge. *Id.* For example, Williams alleges in his amended complaint that he supplemented his EEOC Charge after his original filing. *Id.* at 2 ¶ 70.5. Williams' amended complaint concerns the same conduct and occurrences DuPont allegedly committed. Thus, Williams' § 1981 claim in his amended complaint relates back to his original filing date of June 20, 2014.

Even so, Williams' allegations that are prior to June 20, 2010 pursuant to the four-year statute of limitations, which includes those events that led to his EEOC charge, are not actionable under § 1981. Thus, DuPont's Motion for Partial Dismissal is granted in that Williams' allegations prior to June 20, 2010 are not actionable under § 1981.

### C. Alternative Motion for Summary Judgment

Here, the Court finds it unnecessary to reach DuPont's alternative motion for summary judgement. First, as explained above, the Court has addressed each of DuPont's arguments under Rule 12(b)(6) rather than Rule 56. Second, other than requesting for partial dismissal alternatively under Rule 56 and attaching a statement of uncontested facts, DuPont has done little to establish that summary judgement is appropriate in this case. For example, DuPont did not address in their reply any of Williams' arguments as to why summary judgment is improper in this case. Thus, DuPont's alternative motion for summary judgment is denied.

### V.    Conclusion

Accordingly,

**IT IS ORDERED** that E.I. du Pont de Nemours and Company's Motion for Partial Dismissal, or in the Alternative, Motion for Partial Summary Judgment (Doc. 9) is hereby **GRANTED IN PART** and **DENIED IN PART**;

Defendant's motion is **GRANTED** in that, as a matter of law, Plaintiff's § 1981 claims that are prior to June 20, 2010 are time barred by the four year statute of limitations under 28 U.S.C. § 1658(a);

Defendant's motion is **GRANTED** in that, as a matter of law, Plaintiff's Title VII claims that are prior to 2010 are not actionable as discrete discriminatory acts because Plaintiff failed to administratively exhaust these claims; and,

**IT IS FURTHER ORDERED** that, to the extent that DuPont's motion was intended to reach a hostile work environment claim, DuPont's Motion for Partial Dismissal is **DENIED WITHOUT PREJUDICE**. DuPont is granted leave to file a motion to dismiss on this issue. In all other respects Defendant's motion is **DENIED**.

Signed in Baton Rouge, Louisiana, on <u>July 8, 2015</u>.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**