## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**ALLEN WILLIAMS**

**CIVIL ACTION**

**v.**

**NO. 14-382-JWD-EWD**

**E.I DU PONT DE NEMOURS AND COMPANY**

## RULING AND ORDER

This matter comes before the Court on the Motion for Summary Judgment (Doc. 105) filed by Defendant E.I. du Pont de Nemours and Company ("DuPont"). Plaintiff Allen Williams opposes the motion. (Doc. 106, 107, 116, 118, 122, 125, 130, 132)  Oral argument is not necessary.  After carefully considering the law, the facts in the record, and the arguments of the parties, Defendant's motion is granted in part and denied in part.

Specifically, Defendant's motion is granted in that the following claims are dismissed with prejudice: (1) the Section 1981 claim for disparate treatment and (to the extent made) retaliation for the October 2013 incident of Plaintiff being docked for two hours; (2) the Title VII and Section 1981 claims for disparate treatment and (to the extent made) retaliation for the January 2014 incident of Plaintiff being required to take a vacation day for missed work; and (3) the Section 1981 claims of disparate treatment and retaliation related to being subject to heightened scrutiny, having to submit a doctor's note, and a lack of overtime compared to Caucasian workers.

In all other respects, Defendant's motion is denied.  Specifically, the Court denies the Defendant's motion on the following issues: (1) the Title VII and Section 1981 claim for

disparate treatment for the January 24, 2010, shift change; (2) the Title VII and Section 1981

claims of retaliation for the April 6, 2010, write-up; (3) the claim for overtime and punitive

damages for the shift change and write-up; and (4) the other claims that were asserted by

Plaintiff in his Pretrial Order and that Defendant did not specifically seek to dismiss.

Finally, Plaintiff shall have sixty (60) days from the date of this order to provide proper

authentication for the exhibits specifically noted herein.

## I.       The January 24, 2010, Shift Change

The first issue is the Plaintiff's claims under Title VII and Section 1981 for disparate

treatment for the January 24, 2010, shift change.  Defendant claims that the shift change was not

an adverse employment action because it did not affect the Plaintiff's pay, job duties, or benefits.

Plaintiff rejects this argument and contends that shift change was a transfer to an objectively

worse position.

The Fifth Circuit laid out the appropriate standard for this issue in *Thompson v. City of

Waco, Texas*, 764 F.3d 500 (5th Cir. 2014).  There, the court explained:

> Title VII makes it unlawful for an employer "to fail or refuse to hire or to
> discharge any individual *or otherwise to discriminate* against any individual with
> respect to his compensation, *terms, conditions, or privileges of employment,*
> because of such individual's race...." 42 U.S.C. § 2000e–2(a)(1) (emphasis
> added). To establish a discrimination claim under Title VII or § 1981, a plaintiff
> must prove that he or she was subject to an "adverse employment action"—a
> judicially-coined term referring to an employment decision that affects the terms
> and conditions of employment. *See, e.g., Pegram v. Honeywell, Inc.,* 361 F.3d
> 272, 281–82 (5th Cir. 2004); *see also Burlington N. & Santa Fe Ry. Co. v. White,*
> 548 U.S. 53, 62, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (explaining that the
> language of Title VII's antidiscrimination provision "explicitly limit[s] the scope
> of that provision to actions that affect employment or alter the conditions of the
> workplace").
>
> For Title VII and § 1981 discrimination claims, we have held that adverse
> employment actions consist of "ultimate employment decisions" such as hiring,
> firing, demoting, promoting, granting leave, and compensating. *See McCoy v. City
> of Shreveport,* 492 F.3d 551, 560 (5th Cir. 2007); *Alvarado v. Tex. Rangers,* 492

F.3d 605, 612 (5th Cir. 2007); *Pegram,* 361 F.3d at 282. "[A]n employment action that 'does not affect job duties, compensation, or benefits' is not an adverse employment action." *Pegram,* 361 F.3d at 282 (quoting *Banks v. E. Baton Rouge Parish Sch. Bd.,* 320 F.3d 570, 575 (5th Cir. 2003)).

Additionally, our court has held that a transfer or reassignment can be the equivalent of a demotion, and thus constitute an adverse employment action. *See Alvarado,* 492 F.3d at 612–15. "[T]o be the equivalent to a demotion, a transfer need not result in a decrease in pay, title, or grade; it can be a demotion if the new position proves objectively worse—such as being less prestigious or less interesting or providing less room for advancement." *Id.* at 613 (quoting *Sharp v. City of Hous.,* 164 F.3d 923, 933 (5th Cir. 1999)); *Pegram,* 361 F.3d at 283 ("[A]n employment transfer may qualify as an adverse employment action if the change makes the job objectively worse." (internal quotation marks omitted)); *Hunt v. Rapides Healthcare Sys., LLC,* 277 F.3d 757, 770 (5th Cir. 2001) ("A job transfer that includes a shift change that involves changes in duties or compensation or can be objectively characterized as a demotion may be an 'adverse employment action'...."); *see, e.g., Sharp,* 164 F.3d at 933 ("The jury could have viewed transferring from the elite Mounted Patrol to a teaching post at the Police Academy to be, objectively, a demotion."); *Forsyth v. City of Dall.,* 91 F.3d 769, 774 (5th Cir. 1996) (recognizing as demotions the reassignment of two police officers from the Intelligence Unit to night patrol because the Intelligence Unit positions "were more prestigious, had better working hours, and were more interesting than night patrol" and "few officers voluntarily transferred from the Intelligence Unit to night patrol and other officers had been so transferred as punishment"); *Click v. Copeland,* 970 F.2d 106, 110 (5th Cir. 1992).

*Id.* at 503-04.  *See also Alvarado v. Texas Rangers*, 492 F.3d 605, 614 (5th Cir. 2007) (rejecting Defendant's argument that loss of prestige cannot render a transfer an adverse employment action and explaining that *Pegram v. Honeywell, Inc.*, 361 F.3d 272 (5th Cir. 2004) "stands for the proposition that a plaintiff must 'assert more than a loss of *subjective* prestige," *id.* at 284 (emphasis added); it does not … mean that a plaintiff cannot rely on a loss of *objective* prestige as evidence that a transfer was really a.' demotion").

Further, this Court has recognized that:

An employer's action may constitute an adverse employment action if it "makes the job objectively worse." Additionally, "[a] job transfer that includes a shift change that involves changes in duties or compensation or can be objectively characterized as a demotion may be an adverse employment action...." A transfer can be characterized as a demotion when it involves a transfer from a more

prestigious position to a less prestigious one, particularly if the employer has traditionally used such transfers as a form of discipline or where the new position involves "**significantly** different duties." A purely lateral transfer is one that "does not involve a demotion in form or substance" or that is "[a] transfer involving no reduction in pay and no more than a minor change in working conditions...."

*Mascarella v. CPlace Univ. SNF, LLC*, No. 13-CV-642-SDD-RLB, 2015 WL 2414518, at *7 (M.D. La. May 20, 2015) (citations omitted) (finding adverse employment action when plaintiff suffered parking and restroom problems, claimed her job title changed, was no longer a supervisor, was in a less desirable facility, and was given mostly administrative paperwork).

The Court finds *Bouvier v. Northrup Grumman Ship Systems, Inc*., 350 F. App'x 917 (5th Cir. 2009) persuasive.  Though the Fifth Circuit affirmed the granting of summary judgment on issue of pretext, the appellate court found that the plaintiff, a crane operator, suffered an adverse employment action when her employer suspended her for two days and temporarily reassigned her to the position of crane rigger. *Id.* at 922-23. The Fifth Circuit explained, while "[i]t [wa]s not readily apparent that this was an adverse employment action because crane operator and rigger are similar jobs and she had an opportunity for reinstatement as crane operator," the Court still found an adverse employment action and proceeded with the full *McDonnell Douglas* analysis.  The Fifth Circuit explained:

> However, due to Bouvier's testimony and declarations of her coworkers, we conclude that Bouvier put forward sufficient evidence that the transfer to crane rigger involved a loss of prestige and responsibility. The training required to become a crane operator also demonstrates that employees coveted the operator position and considered it a promotion from crane rigger. *See Alvarado*, 492 F.3d at 614–15 (listing several factors for determining whether a denial of a transfer is an adverse employment action including how the respective  positions are viewed among employees and the skills and training required to transfer).

*Id.*

The Court finds that the Plaintiff has submitted enough evidence to create a genuine issue of fact as to whether the shift change was objectively worse.  The Court bases its decision on the following:

- Most significantly, multiple witnesses testified that "nobody on that plant wants to work with Rene Becnel." (Doc. 106-14 at 9; *see also* Doc. 106-15 at 2, 6.)

- One employee, Simoneaux, testified that Valentine, Plaintiff's allegedly racist supervisor who caused the shift change, told Simoneaux that Becnel "operates half-hazardouxly [sic], he's all over the place running around" and "runs around with his head cut off," and Simoneaux agreed with this assessment. (Doc. 106-14 at 9-10.) According to Plaintiff, Valentine even described Becnel as "crazy." (Doc. 106-2 at 9.) Kent Templet stated that Becnel had a "nervous breakdown." (Doc. 106-11 at 15-16.) Plaintiff submitted evidence supporting this. (*See* Doc. 117 and Exhibit 2-B.) In the video, Becnel is standing over another individual with his hand on the other's head. Becnel is speaking in tongues. (Exhibit 2-B.)

- Williams testified that it would be typical of Valentine's management style to move him to a bad trainer in hopes that Valentine would be able to write him up more easily. (Doc. 106-6 at 21.)

- Williams testified that Becnel would do what he wanted to do (such as decide the amount of acid to make), in direct contradiction to orders given by management, and this causes employees like Williams to "start getting all these alarms." (Doc. 106-2 at 9-11.)  According to Plaintiff, Becnel "did it with everybody.  He did it with Leo.  He did it with me." (*Id.* at 9.)

- Plaintiff submitted evidence which, when construed in a light most favorable to the Plaintiff, would allow a reasonable juror to conclude that a shift change carried a change in duties. (*See, e.g.*, Doc. 106-10 at 7 (the operators "work [the jobs] out among ourselves"); Doc. 106-9 at 16 ("it's not unusual" for operators to "trade off tasks during their shift as long as they get the job done," and it's not "unreasonable to think that that could be, *based on that particular shift*" (emphasis added); *Scott v. DuPont*, No. 14-391, Doc. 55-7 (Williams Declaration) ("The operators on each shift help each other out and divide up responsibilities among themselves as they see fit to best work together and get the tasks of the operators done. … It is normal for operators on a shift to accommodate each other and trade off tasks in order to get the job done within the abilities of those on the shift. … Any of the tasks that an operator is required to perform as part of his job description can be traded among operators on a shift as needed.")).

The Court finds that all of this evidence tends to show that the new shift under Becnel was objectively worse.  At the very least, there is a question of fact as to whether there was a

significant change in duties with a shift change, and the above evidence creates an inference that duties under Becnel would be objectively worse.  But even more importantly, as in *Bouvier*, the Court considers the views of other employees, and other employees disliked working with Becnel.  Thus, putting aside the Plaintiff's subjective views of working under Becnel, the Court finds sufficient evidence for an issue of fact as to whether the new shift was objectively worse, less prestigious, and provided less opportunity for advancement.

In short, a reasonable juror could infer that this shift change was a demotion in substance and more than a minor change in working conditions.  Summary judgment on this issue is denied.

## II.   Failure to Promote

Defendant seeks dismissal of Plaintiff's failure to promote claim.  Plaintiff responds that he "does not bring a separate claim for failure to promote."  Accordingly, Defendant's motion on this issue is denied as moot.

## III.   October 2013 Incident of Being Docked Two Hours

Plaintiff also claims that he was docked two hours pay and not allowed to make up the work whereas a fellow Caucasian operator was allowed to do so.  Defendant claims this fails to meet the standard for an adverse employment action.  Plaintiff responds that this satisfies the test for discrimination and for retaliation.  Defendant questions whether Plaintiff can assert a retaliation claim on this issue.

The Court will grant Defendant's motion on these issues.  As a preliminary matter, contrary to Plaintiff's contention, the same standard applies for Title VII and Section 1981 claims of discrimination and retaliation.  *See Brandon v. Sage Corp*., 808 F.3d 266 (5th Cir. 2015) (applying same standard for adverse employment action for retaliation claims under Title

VII and § 1981); *Anderson v. Sikorsky Support Servs., Inc.*, 66 F. Supp. 3d 863, 872-73 (S.D.

Tex. 2014) (applying same standard for discrimination claims under Title VII and § 1981

because Plaintiff did not allege facts of intentional racial discrimination distinct from those

necessary to allege a Title VII cause of action).  Thus, the Court will apply the same analysis for

each of the claims.

First, as to the discrimination claim, the Court again emphasizes the appropriate standard:

> An "adverse employment action" for Title VII discrimination claims based on race, color, religion, sex, or national origin " 'include[s] only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating.' " *McCoy v. City of Shreveport,* 492 F.3d 551, 559 (5th Cir. 2007), *quoting Green v. Administrators of Tulane Educ. Fund,* 284 F.3d 642, 657 (5th Cir.2002). "Title VII was only designed to address *'ultimate* employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions.' " *Burger v. Central Apartment Mgmt., Inc.,* 168 F.3d 875, 878 (5th Cir. 1999) (emphasis in original), *quoting Mattern v. Eastman Kodak Co.,* 104 F.3d 702, 707 (5th Cir.), *cert. denied,* 522 U.S. 932, 118 S.Ct. 336, 139 L.Ed.2d 260 (1997). . . .  To be actionable, an adverse employment decision must be a "tangible employment action that **constitutes a significant change in employment status**, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or **a decision causing a significant change in benefits.**" *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 764, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

*Jones v. FJC Sec. Servs., Inc.*, 40 F. Supp. 3d 840, 849 (S.D. Tex. 2014), *aff'd sub nom. Jones v.*

*FJC Sec. Servs., Inc.*, 612 F. App'x 201 (5th Cir. 2015) (emphasis added).

Here, Plaintiff asked to come in two hours later because his father was having surgery.

(Doc. 106-2 at 21-23.)  His supervisor gave him the option of using vacation time or being

docked two hours leave. (*Id.*)  Plaintiff ultimately was docked the two hours.[1] (*Id.*) Plaintiff

testified that people like Kent Templet and other operators said they never had to do that. (*Id.*)

---

[1] Though unclear from Plaintiff's testimony, it appears as though, because Plaintiff had no vacation, he was given some other option involving his vacation which the Plaintiff could not recall at his deposition. (Doc. 106-2 at 21-22.) This is, however, unclear.

Even assuming there is an issue of fact as to whether similarly situated Caucasian employees like Kent Templet were treated differently, the Court finds that Plaintiff has failed to establish an adverse employment action to support a discrimination claim.  This is simply not a "significant change in employment status" or "significant change in benefits." *Jones*, 40 F. Supp. 3d at 849 (citation omitted).  This was not an ultimate employment decision.  Thus, this discrimination claim is dismissed.

Second, even assuming that the retaliation claim were properly asserted, the Court finds that no reasonable juror could conclude that this was an adverse employment action.  This Court has explained:

> The Supreme Court has explained that, to demonstrate retaliation, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.' " *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006) (citations omitted). The high court referred to "*material* adversity" because:
>
>> An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience. ... The antiretaliation provision seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms. It does so by prohibiting employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and their employers. And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence.
>
> *Id.* (citations omitted). The Supreme Court referred to a "*reasonable* employee" because "the provision's standard for judging harm must be objective." *Id.* The standard is set forth in "general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Id.*, 548 U.S. at 69, 126 S.Ct. at 2415.

*Mitchell v. Univ. of Louisiana Sys.*, No. CV 13-820-JWD-RLB, 2015 WL 9581823, at *29 (M.D. La. Dec. 30, 2015).

Here, even considering the testimony that this did not happen to other operators, no reasonable juror would conclude that docking an employee for two hours *that he did not work* would dissuade a reasonable worker from making or supporting a charge of discrimination.  This is unquestionably petty, but it is simply not an adverse employment action.  *See Anand v. New York State Dep't of Taxation & Fin.*, No. 10-CV-5142 SJF WDW, 2013 WL 3874425, at *9 (E.D.N.Y. July 25, 2013) (finding that, even under the "lenient" retaliation standard, plaintiff failed to allege an adverse employment action when employer refused "union work-time leave and requir[ed] the plaintiff to use vacation time for a union training session").  To the extent this claim was properly brought, it is dismissed.

### IV.    January 2014 Vacation Day Incident

Defendant also seeks dismissal of Plaintiff's discrimination claim that he was required to take a vacation day in January 2014 because of icy roads.  Defendant claims this is not an adverse employment action and that Plaintiff cannot prove that similarly situated Caucasian employees were treated differently.  Plaintiff contests both issues.

For the same reasons articulated above, the Court will grant summary judgment on this issue.  First, the Court finds that the loss of a single vacation day due to inclement weather is not an "ultimate employment decision" that had a "significant change in employment status" or "significant change in benefits." *Jones*, 40 F. Supp. 3d at 849 (citation omitted).  Thus, the disparate treatment claim is dismissed.

Second, even assuming that the retaliation claim was properly raised and that similarly situated Caucasians were treated differently, the Court finds that no reasonable juror would find that being required to use a single vacation day due to inclement weather would dissuade a reasonable worker from making or supporting a charge of discrimination.  Even if, as Templet

testified, in his 23 years at DuPont, the operators had never been charged vacation for inclement weather, and even if, as Templet said, this was done because of unspecified "troublemakers" (Doc. 106-11 at 5-6), the adverse action alleged by Plaintiff - the loss of a single vacation day due to bad weather – is, at best, a petty slight and minor annoyance. *See, Anand, supra*. Summary judgment on this issue is thus granted.

### V.      April 6, 2010 Write Up

Plaintiff also claims that DuPont retaliated against him when Plaintiff's safety coordinator issued him a write up on April 6, 2010, for an incident involving a hose hanging from a truck.  Defendant claims that, as a matter of law, a reprimand or note to an employee's file does not constitute an adverse employment action.  Plaintiff responds that a written reprimand can legally constitute an adverse employment action and that this reprimand was such under the facts of this case.

For all of the following reasons, the Court will deny summary judgment on this issue. First, a reasonable juror could conclude that the Plaintiff has demonstrated that he has suffered consequences as a result of the write-up. There is, at the very least, a question of fact here. Second, a reasonable juror could also conclude that a reasonable employee would have understood a warning under these circumstances as indicative of a retaliatory mind-set.  Third, an issue of fact exists as to whether there were no colorable grounds for the warning.  And fourth, an issue of fact exists as to whether Plaintiff was dissuaded from pursuing his claim.  Each of these alone may be insufficient to warrant a denial of summary judgment.  But, together, a reasonable juror could conclude that, under all of the facts presented, a reasonable employee would be dissuaded from making or supporting a charge of discrimination.

### A.  Consequences

The Fifth Circuit has explained:

> While a reprimand can serve as the basis for a retaliation claim under certain circumstances, *see Willis v. Cleco Corp.,* 749 F.3d 314, 318 (5th Cir. 2014) (finding that a reprimand supported a retaliation claim where the supervisor previously stated he would find a way to fire plaintiff), we have held that a written reprimand, without evidence of consequences, does not constitute an adverse employment action. *See Hernandez v. Johnson,* 514 Fed.Appx. 492, 499 (5th Cir. 2013); *DeHart v. Baker Hughes Oilfield Operations, Inc.,* 214 Fed.Appx. 437, 442 (5th Cir. 2007).

*Thibodeaux-Woody v. Houston Cmty. Coll.*, 593 F. App'x 280, 286 (5th Cir. 2014).  Thus, a written reprimand can indeed constitute an adverse employment action, depending on the circumstances of the case. *See, e.g., Willis, supra* (reversing lower court's granting of summary judgment dismissing claim for retaliation arising from Disciplinary Warning because supervisor's statement - "If we have to find a reason, [we] have decided; we are going to terminate that nigger Greg Willis for reporting me and trying to burn my ass" - indicated that the "Disciplinary Warning[] [was] issued because of retaliatory intent")*; Drake v. Nicholson*, 324 F. App'x 328, 331 (5th Cir. 2009) (dismissing retaliation claim because plaintiff failed to demonstrate a causal link; "not[ing] that the district court incorrectly found that Drake failed to demonstrate that an adverse employment action occurred"; and finding that "Drake . . . demonstrated that an adverse employment action occurred: he received a reprimand for being absent without leave on April 23, 2001."); *Ford v. Amehyst Construction, Inc.*, No. CV 14-2617, 2016 WL 1312627, at *8 (W.D. La. Apr. 4, 2016) (granting summary judgment of retaliation claims but finding that the "actions about which [plaintiff] complains" – including "(1) issuing her a written reprimand in October 2011, (2) denying her on-the-job training, (3) failing to consider her for promotional opportunities, (4) refusing to allow her to operate larger trucks, and (5) terminating her employment" – "qualify as adverse employment actions for purposes of a retaliation claim.").

Here, Plaintiff brought forward evidence that demonstrate consequences.  First, co-worker Simoneaux committed a "lifesaving rule violation" but was only placed on probation. The plant manager testified that, ordinarily, when a violation like that happens, they consider terminating him. (Doc. 106-8 at 8.)  But with this employee, he was remorseful and "had a good record." (Id.)  The plant manager said that the fact that the other employee had not been written up before was "[a]nother one of the mitigating circumstances, clean record, even with a lifesaving rule violation." (Id. at 8.)  That plant manager also referred to "put[ting] [an employee] on write-up" rather than probation based on mitigating circumstances.

Second, Plaintiff points to a "probation document" for a different employee that refers to an employee "progressing in the corrective discipline process to probation because of continued negative performance." (Doc. 106-13 at 11.)[2]  This included two notes to his file. (*Id.*)

Third, Plaintiff provides the sworn testimony of the plant manager in the trial of *Simoneaux v. E. I. Du Pont…*, No. 3:12-cv-219 (M.D. La.) on January 20, 2015, before Judge Dick.  The manager testified, "the performance management processes has stages.  There's a verbal contact and then there's what's called a note to file.  Some people call it a writeup.  And then there's probation.  And then there's ultimately, if the performance doesn't improve to the level that's expected of the employee, it could lead to termination." (Doc. 106-7 at 4.)

And fourth, Plaintiff has presented other testimony indicating that write ups are a form of disciplinary action.  Plaintiff himself testified to this (Doc. 106-6 at 12), and operator Kent Templet referred to a write up as disciplinary action. (*See* Doc. 106-11 at 19.)  Finally, Human

---

[2] This document was attached to a deposition submitted, but Plaintiff has failed to properly authenticate it or point to where in the record this document was authenticated.  Plaintiff is given 60 days from the issuance of this ruling to properly authenticate this document.

Resources Coordinator Greta Pfalzgraf referred to a note in the file as part of the "corrective discipline process." (Doc. 106-13 at 9.)

Construing these facts in a light most favorable to the Plaintiff, the Court finds that Plaintiff has demonstrated that he has suffered adverse consequences as a result of the write up. A reasonable juror could infer from the above information that being placed on "write up" was the first step in a chain of disciplinary measures and that, having been put on "write up," the Plaintiff is exposed to more severe consequences such as probation and termination as a result of his next infraction. As in *Drake* and the above cases, the reprimand here constitutes an adverse employment action. Thus, this weighs in favor of denying Defendant's motion.

### B. Retaliatory Intent, Colorable Grounds, and Dissuasion

The Court also agrees with Plaintiff's next few arguments, all of which center on *DeHart v. Baker Hughes Oilfield Operations*, Inc., 214 F. App'x 437 (5th Cir. 2007). There, the Court found that a written warning would not have dissuaded a reasonable worker from making or supporting a charge of discrimination because (1) "there were colorable grounds for the warning," (2) "a reasonable employee would have understood a warning under these circumstances was not necessarily indicative of a retaliatory mind-set," and (3) the "warning did not in fact dissuade a charge of discrimination, given that several weeks later ... a charge was filed." *Id.* at 442. Plaintiff argues that the inverse of each of these is true here: (1) there were no colorable grounds for the warning, (2) a reasonable employee would have understood a warning under these circumstances as indicative of a retaliatory mind-set, and (3) he was dissuaded from pursuing his claim. Thus, Plaintiff contends, the Court should find an issue of fact exists as to whether there was an adverse employment action.

Having carefully reviewed the record, the Court finds that the Plaintiff has, at the very least, created issues of fact from which a reasonable juror could find an adverse employment action.  While the Plaintiff points to several facts that highlight a retaliatory intent, the Court is most persuaded by the following:

(1) DuPont's Safety Manager did not immediately report the issue with the hose. (Doc. 106-6 at 10.)  He let the truck leave the site rather than correcting the issue, then went to the control room and asked who was loading the truck. (*Id.* at 9.)  Only after learning that Williams was responsible did he report the incident. (*Id.* at 9-10.)

(2) Valentine had recently given Plaintiff the shift-change (discussed above).  According to Plaintiff, it was typical of Valentine's management style to move Plaintiff to a bad trainer to be able to write him up more easily. (Doc. 106-6 at 21.)

(3) The plant manager told HR that the plant manager ripped up the write up in front of Plaintiff, but this was a lie. (Doc. 106-6 at 15.) When confronted about the lie, the plant manager again told Plaintiff that Plaintiff did not need to worry about the write up. (*Id.*)

(4) Most significantly, according to Plaintiff's declaration, shortly before he received the write up, he provided statements to Human Resources about his concerns over race discrimination in connection with himself and Nathaniel Rapp, another African American coworker, about the shift change discussed above. (Doc. 106-18.) At that time, Plaintiff had heard that Bryan Geason, a former operator at Burnside, had been given write-ups before he was fired. (*Id.*)  Plaintiff also learned from coworkers at the plant that Valentine had mentioned he was going to fire two more people before he retired, and Plaintiff was concerned that he could be one of them. (*Id.*) Plaintiff got the write up shortly after his interview with Human Resources. (*Id.*)  The write up was his first in his ten years at Burnside. (*Id.*)

(5) The write up happened only a few months after Simoneaux made a grievance about the above shift change. (*See* Doc. 106-14 at 11-15.)[3]

Accepting the above facts as true, the Court finds that a reasonable juror – barely – could infer from these facts that the write up was done under circumstances indicative of a retaliatory mind-set.  Under *Willis*, and, by implication, *DeHart*, this is another basis for denying the motion.

---

[3] Plaintiff must properly authenticate the Burnside Complaint Investigation Summary (Doc. 106-14 at 12-15) within 60 days of the issuance of this ruling.

The other two factors from *DeHart* also support denying the motion.  Concerning colorable grounds for a write up, the plant manager testified that, if DuPont did not train an employee on a particular rule, DuPont's policy was not to enforce it. (Doc. 106-8 at 3.)  Yet Plaintiff stated that he was never trained to say that he could not load a truck that a hose was hooked to. (Doc. 106-2 at 24.)  A reasonable juror could thus conclude that the write up should not have been issued.  Thus, Plaintiff has created an issue of fact as to whether there was colorable grounds for the write up.

Plaintiff has also created an issue of fact as to whether he was deterred from pursuing his claim.  Plaintiff attests that "the write-up and the circumstances around it made [him] fearful of further retaliation and apprehensive about filing a charge" and that he only filed the charge after being "repeatedly advised" by his lawyer to do so. (Doc. 106-18 at 2.)  Plaintiff specifically says he was "deterred from doing so until I had to because of deadlines." (*Id.*)  Under these circumstances, the Plaintiff has - again, only barely – created a question for the jury.

### C.  Summary

In sum, *Burlington* requires the Court to consider the circumstances of the case and determine whether the write up would have dissuaded a reasonable worker from making or supporting a charge of discrimination.  Any one of the above arguments may not have been enough by itself to meet this standard.  However, when combined, the Court finds that a reasonable juror could conclude that there was an adverse employment action.  Accordingly, summary judgment on this issue is denied.

### VI.    Doctor's Note, Heightened Scrutiny, and Overtime

The Defendant seeks dismissal of a few miscellaneous claims asserted by Plaintiff.   The Court will address each in turn.

The first is Plaintiff's allegation that he was required to fax a doctor's excuse even though no one else was ever required to do so and even though he was ill.  Even assuming the truth of these facts and construing them in a light most favorable to the Plaintiff, the Court finds that, under *Burlington*, this would not dissuade a reasonable employee from making or supporting a charge of discrimination. *See Mims v. Gen. Motors*, No. 3:09CV617-DPJ-FKB, 2011 WL 4454932, at *13 (S.D. Miss. Sept. 23, 2011) (finding no retaliatory act when employer refused to pay military leave after employee did not provide a clean copy of a Leave and Earnings statement so it could be processed; "Requiring an employee to submit proper paperwork in the employee's possession would not dissuade a reasonable employee from engaging in protected conduct." (citations omitted)).  And requiring a doctor's note is certainly not an ultimate employment decision so as to qualify as an adverse employment action for purposes of a discrimination claim.  Thus, to the extent made, Plaintiff's claims for discrimination and retaliation based on the doctor's note are dismissed.

Plaintiff also claims that the doctor's note was one example of heightened scrutiny.  But the Fifth Circuit has recognized that being subjected to heightened scrutiny is not an adverse employment action. *See Magiera v. City of Dallas*, 389 F. App'x 433, 437 (5th Cir. 2010) (affirming granting of summary judgment and finding that being subjected to more intense scrutiny in Internal Affairs was not an adverse employment action).  And it certainly is not an ultimate employment action.  Thus, to the extent made, these claims too are dismissed.

Finally, Defendant seeks dismissal of the "vaguely" alleged overtime claim.  In the Complaint, Plaintiff alleges that, in December 2010, "Plaintiff was not being offered overtime on the same basis as his Caucasian workers." (Doc. 1 at ¶ 47.)  Plaintiff responds that Valentine's

conduct caused him to go on medical leave, and, when he was out on leave, he did not earn any overtime or premium pay.  Plaintiff testified to this as well. (Doc. 106-2 at 5.)

With respect to the claim asserted in the Complaint, the Court finds that Plaintiff's evidence does not support a finding that this is a viable, independent claim of discrimination or retaliation.  Indeed, when Plaintiff was asked at his deposition if there has ever been a time since 2010 when he was not provided the same overtime opportunity as someone else, he merely said, "I'm sure there has, *I just can't recall it at this time*." (Doc. 105-2 at 3-5.)  When pressed with the question, "Since the time that you've been an operator, are there any facts or circumstances that stand out in your mind where you think you didn't have the same overtime opportunity as every other operator?", Plaintiff responded, "Not that I can recall . . . at this time." (*Id.*)  These conclusory, unsubstantiated statements are insufficient.  To the extent such claims were made, they are dismissed.

However, Plaintiff has created an issue of fact – barely – as to whether he is entitled to these damages for his remaining discrimination and retaliation claims. While extremely weak, this is ultimately a question of damages to be determined by the jury at the trial.  Accordingly, motion for summary judgment on this issue is denied.

## VII.    Punitive Damages

Defendant also contends there is a lack of evidence on the issue of punitive damages. Plaintiff contests this and points to at least six general categories of evidence supporting a finding of punitive damages.  In response, Defendant claims that Plaintiff has shown only time-barred incidents and incidents involving co-workers; Plaintiff has not shown malice and disregard to *his* federally protected rights.

The Fifth Circuit has explained:

Proving punitive damages presents "a higher standard than the showing necessary for compensatory damages, satisfied in 'only a subset of cases involving intentional discrimination.' " [*E.E.O.C. v. Boh Bros. Const. Co.*, 731 F.3d 444, 467 (5th Cir. 2013)] (quoting *Kolstad v. Am. Dental Ass'n,* 527 U.S. 526, 534, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999)). Under Title VII, punitive damages are recoverable only if the employer "engaged in a discriminatory practice ... with malice or with reckless indifference to [an employee's] federally protected rights." 42 U.S.C. § 1981a(b)(1). "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Kolstad,* 527 U.S. at 535, 119 S.Ct. 2118. Malice has been described as "evil motive or intent," and reckless indifference has been described as "a 'subjective consciousness' of a risk of injury or illegality and a 'criminal indifference to civil obligations.' " *Id.* at 536, 119 S.Ct. 2118 (quoting *Smith v. Wade,* 461 U.S. 30, 37 n. 6, 41, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983)). "Pointing to evidence of an employer's egregious behavior would provide one means of satisfying the plaintiff's burden to 'demonstrate' that the employer acted with the requisite 'malice or ... reckless indifference,' " but "an employer's conduct need not be independently 'egregious' to satisfy § 1981a's requirements for punitive damages award." *Id.* at 539, 546, 119 S.Ct. 2118 (quoting 42 U.S.C. § 1981a(b)(1)).

*Henry v. CorpCar Servs. Houston, Ltd.*, 625 F. App'x 607, 614 (5th Cir.), *reh'g denied* (Mar. 5, 2015), *cert. denied,* 136 S. Ct. 104, 193 L. Ed. 2d 36 (2015). As one district court explained:

A plaintiff who prevails on his Title VII claim may recover punitive damages if he makes the required showing. Following the Supreme Court's decision in *Kolstad v. Am. Dental Ass'n,* 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999), the Fifth Circuit has set forth the standard to be applied when an employer is alleged to be liable for punitive damages based on the actions of a managerial employee:

A plaintiff may recover punitive damages if the defendant acted "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). The availability of punitive damages turns on the defendant's state of mind, not the nature of the defendant's egregious conduct. *Kolstad* [ ], 527 U.S. [at 535, 119 S.Ct. 2118]. The employer "must at least discriminate in the face of a perceived risk that its actions will violate" the [discrimination statute]. *Id.* at 536, 119 S.Ct. 2118. Moreover, the plaintiff must show that the "malfeasing agent served in a 'managerial capacity' and committed the wrong while 'acting in the scope of employment.' " *Rubinstein v. Adm'rs of the Tulane Educ. Fund,* 218 F.3d 392, 405 (5th Cir. 2000) (citing *Kolstad,* 527 U.S. at 541, 119 S.Ct. 2118). However, under the good-faith exception, "an employer may not be vicariously liable for the discriminatory employment decision of managerial agents where these decisions are contrary to the employer's good-faith efforts to comply with Title VII." *Id.* (citing

> *Kolstad,* 527 U.S. at 545, 119 S.Ct. 2118) (internal quotation marks omitted).

*Carpenter v. Mississippi Valley State Univ.*, 807 F. Supp. 2d 570, 598-99 (N.D. Miss. 2011) (quoting in part *E.E.O.C. v. E.I. Du Pont de Nemours & Co.,* 480 F.3d 724, 732 (5th Cir. 2007)).

The Court finds that there are issues of fact as to the availability of punitive damages. Construing the facts in a light most favorable to the Plaintiff, the April 29, 2010, EEOC determination that Defendant violated Bryan Geason's rights (Doc. 106-12) could create for a reasonable juror an inference that Defendant was aware of its obligations owed under Title VII. The same inference could be made from knowledge of Simoneaux's EEOC complaint in February 2010. (Doc. 132-1 at 35-36.)  Based on all of the facts discussed above, a reasonable juror could conclude that the Defendant acted with malice or reckless indifference to the Plaintiff's rights with respect to the remaining claims.

Other evidence also supports this finding.  Specifically, a human resources employee also testified that she did not recall investigating race discrimination with regard to Plaintiff. (Doc. 106-13 at 5.)  This reflects reckless indifference.  Moreover, issues of fact exist as to whether Defendant was truthful in George Valentine's 2012 individual performance plan (106-4 at 6-27); construing the facts in a light most favorable to the Plaintiff, this document did contain misrepresentations, and this further shows malice.

In sum, the punitive damage claim, like Plaintiff's other surviving claims, is weak.  But, at this time, a genuine issue of material fact exists as to whether Defendant acted with malice and reckless indifference.  For this reason, Plaintiff's punitive damage claim will not be dismissed at this time.

**VIII.   Other Claims and Procedural Issues**

Plaintiff claims that Defendant has failed to address all of his claims because it looked at

the Complaint rather than the ninety-four page Pretrial Order, thirty-three pages of which consisted of Plaintiff's claims. (*See* Doc. 87.)  Plaintiff states that, in the pretrial order, he raised other claims found during discovery.  Indeed, the Plaintiff's proposed jury interrogatories appear to assert at least four claims not addressed by Defendant in the instant motion. (*See* Doc. 139.) Since the Defendant did not specifically seek to dismiss these claims, the Court will not do so here.

IX.     **Conclusion**

Accordingly,

**IT IS ORDERED** that DuPont's Motion for Summary Judgment (Doc. 105) is **GRANTED IN PART** and **DENIED IN PART;**

**IT IS FURTHER ORDERED** that the motion is **GRANTED** in that the following claims are **DISMISSED WITH PREJUDICE**: (1) the Section 1981 claim for disparate treatment and (to the extent made) retaliation for the October 2013 incident of Plaintiff being docked for two hours; (2) the Title VII and Section 1981 claims for disparate treatment and (to the extent made) retaliation for the January 2014 incident of Plaintiff being required to take a vacation day for missed work; and (3) the Section 1981 claims of disparate treatment and retaliation related to being subject to heightened scrutiny, having to submit a doctor's note, and a lack of overtime compared to Caucasian workers;

**IT IS FURTHER ORDERED** that, in all other respects, Defendant's motion is **DENIED**.  Specifically, the Court denies the Defendant's motion concerning (1) the Title VII and Section 1981 claim for disparate treatment for the January 24, 2010, shift change; (2) the Title VII and Section 1981 claims of retaliation for the April 6, 2010, write-up; (3) the claim for overtime and punitive damages for the shift change and write-up; and (4) the other claims that

were asserted by Plaintiff in his Pretrial Order and that Defendant did not specifically seek to dismiss; and

**IT IS FURTHER ORDERED** that Plaintiff shall have sixty (60) days from the date of this order to provide proper authentication for the exhibits specifically noted herein.

Signed in Baton Rouge, Louisiana, on <u>April 11, 2016</u>.


                              _____

                              **JUDGE JOHN W. deGRAVELLES**
                              **UNITED STATES DISTRICT COURT**
                              **MIDDLE DISTRICT OF LOUISIANA**